575 F.2d 896
 97 L.R.R.M. (BNA) 3083, 188 U.S.App.D.C. 15,
83 Lab.Cas. P 10,405
 INTERNATIONAL ORGANIZATION OF MASTERS, MATES AND PILOTS,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Cove Tankers Corporation District 2, Marine Engineers
Beneficial Association-Associated Maritime
Officers, AFL-CIO, Intervenors.
 No. 76-1633.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 29, 1977.
Decided March 6, 1978.
 
 Petition for Review and Cross-Application for Enforcement of Order of the National Labor Relations Board.
 Jerry D. Anker, Washington, D. C., with whom Burton M. Epstein, New York City, and Robert E. Nagle, Washington, D. C., were on the brief, for petitioner.
 Aileen Armstrong, Atty., N.L.R.B., Washington, D. C., with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on the brief, for respondent.
 Roger H. Briton, New York City, of the bar of the Supreme Court of New York, pro hac vice, by special leave of court, for intervenor, Cove Tankers Corporation. Andrew E. Zelman, Washington, D. C., was on the brief for intervenor, Cove Tankers Corp.
 Richard H. Markowitz, New York City, was on the brief for intervenor, District 2, Marine Engineers Beneficial Association-Associated Maritime Officers, AFL-CIO.
 Before BAZELON, Chief Judge, and TAMM and WILKEY, Circuit Judges.
 Opinion for the court filed by Circuit Judge TAMM.
 TAMM, Circuit Judge:
 
 
 1
 Petitioner International Organization of Masters, Mates and Pilots, AFL-CIO (IOMMP) seeks review of a final adjudication of the NLRB[1] (the Board), and the Board cross-petitions for enforcement of its order.[2] See 29 U.S.C. § 160(e)-(f) (1970). Based upon our review of the record and the applicable law, we conclude that the Board's order was supported by substantial evidence and that the Board applied the correct legal principles to the facts. Accordingly, we affirm the decision of the Board, and we grant the cross-petition for enforcement of its order.
 
 
 2
 * This is another in a series of cases growing out of the prolonged struggle between IOMMP and District 2, Marine Engineers Beneficial Association-Associated Maritime Officers, AFL-CIO (MEBA). Because a description of the conflict has been given so well by the Fifth Circuit in International Organization of Masters, Mates & Pilots v. NLRB (Westchester Marine Shipping Co.), 539 F.2d 554 (5th Cir. 1976), cert. denied, --- U.S. ----, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977), we need not set out the full history once again. It suffices to say merely that IOMMP and MEBA each represents licensed deck officers, and that the two are in intense competition.
 
 
 3
 The facts giving rise to this appeal center upon IOMMP's[3] picketing of, and filing an in rem action against, the Mount Explorer, owned at the time in question by intervenor Cove Tankers Corporation (Cove).[4] Until early 1975, the Mount Explorer was called the William J. Fields. It was owned by the Syracuse Corporation, operated by the Texas City Tankers Corporation, and manned by licensed deck officers from IOMMP. The vessel was laid-up and sold to Cove, its IOMMP licensed deck officers having been compensated.
 
 
 4
 After a period of time in a Galveston, Texas, layberth, the vessel emerged as the Mount Explorer, manned with licensed deck officers from MEBA. In late April 1975, the Mount Explorer docked at Brady Island and the Crown Oil refinery, both of which are in or near the Port of Houston, Texas. At both facilities, the vessel was met with picket signs reading:WE HAVE A CURRENT COLLECTIVE BARGAINING AGREEMENT COVERING THIS SHIP. IT WAS FORMERLY NAMED THE S/S WILLIAM J. FIELDS. IT IS NOW CALLED THE S/S MOUNT EXPLORER. OUR COLLECTIVE BARGAINING AGREEMENTS WITH PLAZA SHIPPING COMPANY[5] AND TEXAS CITY TANKERS CORP.[6] COVER THIS VESSEL.
 
 
 5
 OFFSHORE DIVISION INTERNATIONAL ORGANIZATION OF MASTERS, MATES AND PILOTS.
 
 
 6
 The vessel received its cargo in spite of the picketing.
 
 
 7
 On April 25, 1975, while the vessel was still docked near Houston, an in rem action was filed in the United States District Court for the Southern District of Texas, Houston Division, on behalf of the IOMMP licensed deck officers who served under the contract with Texas City Tankers Corporation.[7] See General Counsel's Exhibit (G.C. Exh.) 11, Appendix (App.) at 437. The lien was released after the filing of a $100,000.00 bond, and the Mount Explorer departed.
 
 
 8
 In June 1975, the vessel returned to the Port of Houston, and was again subjected to picketing. The signs read:
 
 
 9
 WE ARE NOT CLAIMING ANY RIGHT TO THE JOBS ON THE S/S MOUNT EXPLORER.[8] AS A RESULT OF ITS HAVING BEEN OPERATED AS THE S/S WILLIAM J. FIELDS BY THE TEXAS CITY TANKER COMPANY WE DO CONTEND THAT PACK, KAHN AND BERKE[9] THROUGH THEIR CONTROLLED CORPORATIONS AND AFFILIATES HAVE VIOLATED THEIR COMMON LAW CONTRACTUAL OBLIGATIONS WITH THE I O M M & P OFFSHORE DIVISION RELATING TO THE OPERATION OF THE S/S MOUNT EXPLORER. THIS VESSEL IS BEING OPERATED WITH SUBSTANDARD MANNING. WE HAVE NO DISPUTE WITH ANY OTHER VESSEL AT THIS FACILITY.
 
 
 10
 INTERNATIONAL ORGANIZATION[10] OF MASTER MATES AND PILOTS OFFSHORE DIVISION.
 
 
 11
 In contrast to what happened in April 1975, the picketing managed to halt the loading of the ship. A temporary restraining order was obtained to halt the picketing.
 
 
 12
 The Board's general counsel brought unfair labor practice proceedings, charging that IOMMP's conduct had violated sections 8(b)(1)(B), 8(b)(4), and 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(B),[11] (b) (4),[12] (e)[13] (1970). The Administrative Law Judge (ALJ) found for the general counsel, and, on appeal, the Board affirmed the sections 8(b)(1)(B) and 8(b)(4) violations, but dismissed the section 8(e) violation.
 
 II
 
 13
 We perceive the principal issue as whether there is substantial evidence in the record as a whole to support the underlying findings of fact. 29 U.S.C. § 160(e)-(f) (1970). See generally 5 U.S.C. § 706(2)(E) (1976); NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Insofar as relevant to the contentions raised by petitioner on this appeal, the Board adopted the ALJ's determinations that the picketing and the filing of the in rem action were directed toward (1) replacement of the MEBA officers with IOMMP members, (2) recognition of IOMMP by Cove, (3) adoption of the standard-form IOMMP collective bargaining agreement by Cove. 224 N.L.R.B. 1626, 1633-35 (1976).
 
 
 14
 Strong evidence supporting the findings of fact may be found in the wording of the first set of picket signs: "We have a current collective bargaining agreement covering this ship." The standard IOMMP collective bargaining agreement requires that IOMMP be recognized as the sole collective bargaining representative of the licensed deck officers, G.C. Exh. 7, § II(1), App. at 417, and that replacements be IOMMP members generally hired through IOMMP hiring halls. Id., § II, App. at 417-18; Transcript (Tr.) at 161, App. at 131. Thus, the assertion that there is a "current collective bargaining agreement covering this ship" has manifold significance. First, it is equivalent to a demand that IOMMP be recognized as the sole collective bargaining representative of the licensed deck officers, and, second, it implies that Cove violated the section II replacement procedures of the IOMMP contract. Thus, the assertion of a collective bargaining agreement is totally inconsistent with the theory now advanced by petitioner id est, that it was merely seeking wages.
 
 
 15
 It is clear that IOMMP employed a standard form collective bargaining agreement the so-called "Master Collective Bargaining Agreement" which, by its own description, covered all employers under contract with IOMMP. G.C. Exh. 7 at 1, App. at 417; see Tr. at 124-26, App. at 98-100; Tr. at 146-48, App. at 119-21. As noted above, adoption of the terms of the standard agreement by Cove would have required, inter alia, that IOMMP be recognized exclusively, and, by clear logical extension, that the MEBA officers be replaced.[14] See Tr. at 164, App. at 133; Tr. at 173, App. at 140; Tr. at 205-10, App. at 158-63.
 
 
 16
 The evidence provided by the wording of the signs is, in our view, of particular qualitative value in that the wording was prepared in consultation with counsel. G.C. Exh. 2 at 4, App. at 373; Tr. at 74, App. at 59; Tr. at 76, App. at 61. In view of the holding of this court in International Organization of Masters, Mates & Pilots v. NLRB (Marine & Marketing International Corp.), 159 U.S.App.D.C. 11, 486 F.2d 1271 (1973) (per curiam), cert. denied, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974), to the effect that replacement picketing violates section 8(b)(1)(B), IOMMP acted perilously indeed by broadly asserting the existence of a current collective bargaining agreement. If IOMMP were in fact limiting itself to a claim for wages, it seems that, as a matter of common sense, this limited purpose would have been disclosed plainly by the picket signs. Neither set of picket signs reveals that IOMMP's intent was to limit itself to a claim for wages.[15] See Tr. at 177-78; App. at 144-45. Captain Holdeman did not express the "fact" of IOMMP's limited objective to Cove, nor, to his knowledge,[16] did anyone at IOMMP directly communicate this "fact" to Cove. Id. This continued failure to give Cove effective notification is quite persuasive evidence that IOMMP's true purpose did not change from April to June 1975.[17]
 
 
 17
 Another important piece of evidence is Captain Holdeman's newspaper article in the May 1975 issue of The Master, Mate & Pilot. G.C. Exh. 2 at 4, App. at 373. Captain Holdeman, a vice president of IOMMP's Offshore Division and port agent for Galveston, Tr. at 68, App. at 54, was, by his own admission, a prime mover in the decision to picket and in the picketing itself. See Tr. at 74, App. at 59; Tr. at 76, App. at 61; Tr. at 97-98, App. at 81-82.
 
 
 18
 The headline of the article is: "MM&P (IOMMP) to Fight for Jobs on Runaway Ship MOUNT EXPLORER." G.C. Exh. 2 at 4, App. at 373 (emphasis added). The body of the article states that the Mount Explorer "was then, before and always under contract to . . . MM&P (IOMMP) for the Master and Mates," and, therefore, IOMMP "was going to fight." Id. The author goes to express his general concern for IOMMP jobs in the face of MEBA "raids," and he specifically characterizes MEBA's actions with respect to the Mount Explorer as a "raid." Id. Captain Holdeman gives the same characterization in his oral testimony. Tr. at 140, App. at 114; see Tr. at 208, App. at 161. Taken together, this evidence provides substantial support for the finding that "an essential element of . . . (the) rivalry (between IOMMP and MEBA) is a battle over jobs a battle to determine whether the ships involved shall be manned by members of IOMMP dispatched from its hiring halls or by . . . MEBA members from that union's hiring halls." 224 N.L.R.B. at 1635.
 
 
 19
 Captain Holdeman goes on to render a description of the circumstances surrounding the filing of the in rem action:[18]
 
 
 20
 Now, it was becoming noticeable that we were faced with too many legal road blocks. A "hard" picket line would bring fast action from the courts in the form of an injunction. A "soft" picket line is ineffective and frustrating to the members. Something new had to be added.
 
 
 21
 Friday, the Legal Beagles came up with a suit against the vessel for the wages of the dispossed (sic ) Master and Mates from pay-off to the end of the contract. Since they were on the picket line, they were easy to get in touch with. All gave their permission and the Vice President of the Gulf authorized the suit in the name of the Organization.
 
 
 22
 The next step was to slap a lien on the vessel with a $100,000.00 bond. This was done at 15:10, Friday, the 25th (of April 1975).
 
 
 23
 G.C. Exh. 2 at 4, App. at 373. Thus, there is abundant evidence that the genesis of the in rem action was approximately contemporaneous with the first, relatively ineffectual picketing, that the idea for the in rem action flowed from the "Legal Beagles" to the plaintiffs in that action, that the go-ahead for the suit came from IOMMP, that it was related intimately to the ongoing picketing, and, indeed, that it was intended as a dramatic, tactical supplement to the picketing. This interpretation of these events is confirmed by the testimony of Captain Holdeman. See Tr. at 195-97, App. at 148-50. See also Tr. at 87-89, App. at 71-73; Tr. at 205-10, App. at 158-63. Thus, we conclude that substantial evidence supports the ALJ's conclusions that the wage claim in the lawsuit was "an afterthought, constituting a strategem to mask Respondent's (IOMMP's) real intent," 224 N.L.R.B. at 1634, and that the lawsuit was filed in furtherance of IOMMP's " 'larger objective,' " id. Both of these determinations were adopted expressly by the Board. Id. at 1626 n.2. Further, we do not disagree with the Board's own finding that "the filing of the lawsuit may not have been taken in complete good faith." Id.
 
 
 24
 In its brief, IOMMP contends that it was attempting scrupulously to conform its conduct to the law as established in Marine & Marketing International Corp. and Westchester Marine Shipping Co.[19] See Brief for Petitioner at 29-34. IOMMP argues that its past violations are not highly probative in logic of the fact that it violated the law in this instance. We are inclined to agree. On the other hand, we must note that its past violations are not particularly persuasive evidence that IOMMP did not break the law in this instance, contrary to petitioner's argument. See Brief for Petitioner at 29-34. From our examination of the record evidence, we must conclude that the findings were supported by substantial evidence.
 
 III
 
 25
 Insofar as is relevant here, section 8(b)(1)(B) makes it an unfair labor practice for a "labor organization" to "restrain or coerce . . . an employer in the selection of his representatives for the purpose( ) of . . . the adjustment of grievances." 29 U.S.C. § 158(b)(1)(B) (1970). Relying upon the decision of this court in Marine & Marketing International Corp. and its own prior decision in Westchester Marine Shipping Co.,[20] the Board held that IOMMP violated section 8(b)(1)(B) by its picketing and its filing of an in rem action with the object of having Cove replace its MEBA crew, recognize IOMMP, and adopt IOMMP's terms. 224 N.L.R.B. at 1626, 1634-36.
 
 
 26
 Licensed deck officers are "supervisors" within the meaning of29 U.S.C. § 152(11) (1970). See Brief for Petitioner at 8. IOMMP, however, also represents a number of "employees" as defined by 29 U.S.C. § 152(3) (1970).[21] The master and chief mate have grievance adjustment responsibility, 224 N.L.R.B. at 1632, and are "representatives" under 29 U.S.C. § 152(4) (1970) and section 8(b)(1)(B). Westchester Marine Shipping Co., 539 F.2d at 556. Because of its "employee" membership, IOMMP is a "labor organization" under 29 U.S.C. § 152(5) (1970), and therefore is subject to the restraints embodied in section 8(b)(1)(B). Westchester Marine Shipping Co., 539 F.2d at 559-60; Marine & Marketing International Corp., 486 F.2d at 1273-74.
 
 
 27
 Petitioner once again seeks to relitigate its contention that, as a matter of statutory interpretation, it is not subject to section 8(b)(1)(B) restraints when it is not acting on behalf of its "employee" membership. Brief for Petitioner at 35-51; Petitioner's Reply Brief at 2-12. Petitioner urges us to overrule the decision of this court in Marine & Marketing International Corp., arguing, inter alia, that it is undercut substantially by the Supreme Court's decision in Florida Power & Light Co. v. International Brotherhood of Electrical Workers, Local 641, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974). In rejecting petitioner's interpretation of section 8(b)(1)(B), we find that we are unable to improve upon the excellent reasoning of Judge Ainsworth in Westchester Marine Shipping Co., and therefore we adhere to it.
 
 
 28
 IOMMP, relying upon NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), argues that this application of section 8(b)(1)(B)[22] violates its constitutionally protected right of association. Brief for Petitioner at 51-53; Petitioner's Reply Brief at 7 n.4. We are unable to subscribe to petitioner's analysis. It has been held that the first amendment protection to the right of association applies to union membership, American Federation of State, County & Municipal Employees v. Woodward, 406 F.2d 137 (8th Cir. 1969); McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968), and that a significant encroachment on first amendment rights will trigger the exacting analysis of NAACP v. Alabama, Buckley v. Valeo, 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam); accord, Elrod v. Burns, 427 U.S. 347, 362, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (principal opinion) (Brennan, J.); see NAACP v. Alabama ex rel. Patterson, 357 U.S. at 460-62, 78 S.Ct. 1163.
 
 
 29
 Because the petitioner has not "tendered record evidence of the sort proffered in NAACP v. Alabama," Buckley v. Valeo, 424 U.S. at 71, 96 S.Ct. at 660; see NAACP v. Alabama ex rel. Patterson, 357 U.S. at 462-63, 78 S.Ct. 1163, we think that "NAACP v. Alabama is inapposite," Buckley v. Valeo, 424 U.S. at 70, 96 S.Ct. 612. Based upon the reasons set forth in Westchester Marine Shipping Co., 539 F.2d at 559-61, and those in Marine & Marketing International Corp., 486 F.2d at 1274-75, we are of the view that the burdens on first amendment associational rights imposed by section 8(b) are outweighed by the countervailing governmental interests. Buckley v. Valeo, 424 U.S. at 71-72, 96 S.Ct. 612. See also Beasley v. Food Fair of North Carolina, Inc., 416 U.S. 653, 660-61, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974).
 
 IV
 
 30
 The Board also found that petitioner's actions had violated section 8(b)(4), 29 U.S.C. § 158(b)(4) (1970). 224 N.L.R.B. at 1626. Section 8(b)(4) provides, in relevant part, that it is an unfair labor practice for a "labor organization"(i) . . . to induce or encourage any individual employed . . . in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment . . . to perform any services; or (ii) to threaten, coerce, or restrain any person engaged . . . in an industry affecting commerce, where in either case an object thereof is
 
 
 31
 (A) forcing or requiring any employer . . . to enter into any agreement which is prohibited by subsection (e) . . . .
 
 
 32
 29 U.S.C. § 158(b)(4) (1970).
 
 
 33
 Section 8(e) proscribes "hot cargo" agreements, defined in part as an agreement in which an employer agrees "to cease doing business with any other person . . . ." 29 U.S.C. § 158(e) (1970). The so-called "sales and transfers" clause[23] of the standard IOMMP agreement is a "union signatory clause" and has been held to be a section 8(e) "hot cargo" clause. International Organization of Masters, Mates & Pilots (Seatrain Lines, Inc.), 220 N.L.R.B. 164, 171-73 (1975). See also Danielson v. International Organization of Masters, Mates & Pilots, 521 F.2d 747, 751-55 (2d Cir. 1975). The question, then, is whether the picketing and in rem action had an unlawful objective that is, attempting to force Cove to sign the standard contract of IOMMP.
 
 
 34
 We have found that the determination that IOMMP's actions were directed towards forcing the terms of IOMMP's contract upon Cove is supported by substantial evidence in the record. See text, supra at --- - --- of --- U.S.App.D.C., at 902-904 of 575 F.2d. IOMMP argues that, in order to make a finding of a violation of section 8(b)(4), there must be a showing that IOMMP's actions were directed specifically at forcing adoption of the "sales and transfers" clause by Cove that is, that IOMMP "would have continued to picket even if Cove had offered to reinstate all the former MMP (IOMMP) deck officers and to sign a contract containing all the terms of the standard MMP (IOMMP) contract except that particular provision." Brief for Petitioner at 60-61. We do not share this interpretation. Clearly, it is not necessary to find that the sole object of IOMMP's action was to force adoption of a clause proscribed by section 8(e). NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). "A strike or other coercive action to obtain a contract clause which is unlawful under section 8(e) is also an unfair labor practice under the express language of section 8(b)(4)(A)." NLRB v. Amalgamated Lithographers of America (Ind.), 309 F.2d 31, 42-43 (9th Cir. 1962), cert. denied, 372 U.S. 943, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963). It is sufficient if any object is unlawful. Id. at 43. As noted above, there is substantial evidence supporting the finding that an object was to force adoption of the standard agreement, including the "sales and transfers" clause. We therefore uphold the Board's finding of a section 8(b)(4) violation.
 
 V
 
 35
 IOMMP maintains that the Board should not have found the filing of an in rem action to be an unfair labor practice as such a finding would be inconsistent with the doctrine of Clyde Taylor Co., 127 N.L.R.B. 103 (1960). The principle relied on by petitioner is that the Board "should accommodate its enforcement of the Act to the right of all persons to litigate their claims in court, rather than condemn the exercise of such right as an unfair labor practice." Id. at 109; see Brief for Petitioner at 65; Petitioner's Reply Brief at 17.
 
 
 36
 The language relied upon by petitioner does not indicate that the filing of a lawsuit will never be regarded as an unfair labor practice, nor do we interpret it to have such a meaning. Rather, the language is, in our view, a mere expression of a general liberality in accommodating the filing of lawsuits. Where, as here, the lawsuit was coupled with a lien, and was intimately related to ongoing picketing for an unlawful objective, and "may not have been taken in complete good faith," 224 N.L.R.B. at 1626 n.2, we can see no inconsistency between Clyde Taylor Co. (and its progeny) and the Board's determination in this instance.
 
 
 37
 The doctrine, as subsequently developed in Television Wisconsin Inc.,224 N.L.R.B. 722, 722 n.2 (1976) ("We agree with the Administrative Law Judge's finding that the Union's action in filing a suit to enforce an unlawful union-security clause violated Sec. 8(b)(1)(A) of the Act not because of the Union's subjective intent, but because of the unlawful objective sought by the Union.") (emphasis added), would appear to contemplate a situation such as our own. Where, as here, a union files an in rem action with an unlawful objective, and "the filing of the lawsuit may not have been taken in complete good faith," we will not decline to affirm, on the basis of Clyde Taylor Co., the Board's determination that an unfair labor practice has occurred.
 
 VI
 
 38
 We have examined the order of the Board and have found it to be tailored properly to the violation and to be in accordance with applicable law. See Westchester Marine Shipping Co., 539 F.2d at 561. IOMMP urges that the order should be modified so as to permit picketing for IOMMP's non-replacement objectives as presented here. We agree with the Fifth Circuit that "the practical effect of seeking these other objects is . . . tantamount to coercion of the employers in the selection of their licensed deck officers." Id.
 
 
 39
 Thus the cross-petition for enforcement is granted, and the petition for review is denied.
 
 
 40
 So ordered.
 
 
 
 [1]
 224 N.L.R.B. 1626 (1976)
 
 
 [2]
 Cove Tankers Corporation (Cove), the affected employer and the charging party in the administrative proceedings, and District 2, Marine Engineers Beneficial Association Associated Maritime Officers, AFL-CIO (MEBA), the intervenor in the administrative proceedings, intervened in this appeal on behalf of the NLRB. See Fed.R.App.P. 15(d)
 
 
 [3]
 The Administrative Law Judge (ALJ) concluded that IOMMP, and not merely its Offshore Division, was responsible for the alleged unfair labor practices. 224 N.L.R.B. at 1632. This finding was adopted by the three-member panel delegated by the NLRB to hear the case. Id. at 1626. See generally Int'l Org. of Masters, Mates & Pilots v. NLRB (Westchester Marine Shipping Co.), 539 F.2d 554, 558-59 (5th Cir. 1976), cert. denied, --- U.S. ----, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977). Although the factual finding was not challenged explicitly on appeal, see Brief for Petitioner at 29-34, we have reviewed it nevertheless, and we have determined that it is supported by substantial evidence on the record. See 29 U.S.C. § 160(e)-(f) (1970)
 
 
 [4]
 Cove is a wholly-owned subsidiary of Lawrence Shipping Corporation. Lawrence is owned in equal parts by Herman Berke, Samuel Kahn, and Warren Pack
 
 
 [5]
 This is apparently an allegation that Cove was covered by the "subsidiary and affiliate" clause of the contract with Plaza. The relevant section provides as follows:
 SECTION V. VESSELS BOUND BY THE AGREEMENT
 
 
 [1]
 Coverage of Agreement
 a. Vessel Coverage. This Agreement covers the Licensed Deck Officers employed on oceangoing U.S.-flag vessels, owned, operated or bareboat chartered (both at present or at any time during the life of this Agreement) by the Company or any of its subsidiaries or affiliates (whether so at present or at any time during the life of this Agreement) as an owner, agent, operator or bareboat charterer.
 b. Subsidiary and Affiliate. The term "subsidiary" or "affiliate" shall be deemed to include any business entity whether corporate, partnership, trust, individual, or otherwise, which is effectively controlled by or effectively controls the Company either directly or indirectly.
 c. Requirement of Subsidiary or Affiliate to Execute the Collective Bargaining Agreement. The Organization may in its discretion at any time require that any such subsidiary or affiliate execute this Agreement and a refusal to do so will give the Organization the right, upon a ten (10) day written notice to the Company, to cancel this Agreement. The failure of the Organization to request a subsidiary or affiliate to sign this Agreement shall not in any way affect the obligation of the Company herein that this Agreement does cover and include all the Licensed Deck Officers on all the vessels described above whether owned or operated by the Company or any of its subsidiaries or affiliates.
 
 
 [2]
 Sales and Transfers
 a. With regard to any sale, charter (but not including a vessel which the Company may be operating under a bareboat charter and the charter is terminated) or any manner of transfer (except sales to foreign flag) of the Company's vessel:
 i. At least seventy-two (72) hours prior to the date of the effective transfer of the vessel, written notice must be given to the Organization by the Company.
 ii. The execution by the purchaser, charterer or transferee of the Organization's collective bargaining agreement shall be a condition precedent to any sale, charter or transfer.
 iii. If the Company violates subsection 2(a)(ii) above, the Arbitrator may include as part of his award, loss of wages and contributions to the various Organization Plans.
 iv. A violation of subsection 2(a)(ii) above shall also permit the Organization to cancel the no-strike provisions of this Agreement.
 General Counsel's Exhibit (G.C. Exh.) 7, Appendix (App.) at 419. Plaza Shipping, Inc. had been owned by Herman Berke and had used Mount Shipping Co. ("Old Mount") as its operating agent. Plaza had been an IOMMP signatory and had operated the Julie, but sold it in the spring of 1973. Plaza was subsequently dissolved.
 
 
 [6]
 The basis of the reference to the Texas City Tankers Corp. is not absolutely clear. IOMMP appears to maintain that the reference to Texas City Tankers Corp. was predicated upon the "subsidiary and affiliate" clause of the contract with Texas City Tankers Corp. See Brief for Petitioner at 16. The ALJ noted that IOMMP argued that the Lawrence group of companies was obligated under the "subsidiary and affiliate" clause. 224 N.L.R.B. at 1631. The ALJ found that Cove was not bound to IOMMP by this clause, id. at 1633, and noted the inconsistency between this assertion and the assertion that IOMMP was not seeking replacement of the MEBA deck officers. Id. at 1635. In its brief, petitioner appears to abandon its contention that Cove was bound under the "subsidiary and affiliate" clause, see Brief for Petitioner at 30 n.8, and maintains that IOMMP only desired expected wages. Id. at 29-34
 
 
 [7]
 At oral argument, counsel for petitioner did not disagree when it was pointed out that the standard contract of IOMMP would have called for replacement through IOMMP's hall, but not necessarily with the personnel who were plaintiffs in the in rem action
 
 
 [8]
 There existed some doubt as to whether there is a period here. Compare Brief on Behalf of Intervenor Cove Tankers Corporation at 10 with Brief for Petitioner at 15 and Brief for National Labor Relations Board at 12 and 224 N.L.R.B. at 1630
 
 
 [9]
 This is another reference to the "subsidiary and affiliate" clause of the contract. See notes 5 & 6 supra. For a more complete discussion, see 224 N.L.R.B. at 1631-35
 
 
 [10]
 There is some question as to whether this read "organization" or "order." See 224 N.L.R.B. at 1630 n.6. We cannot perceive any consequence in the difference
 
 
 [11]
 29 U.S.C. § 158(b)(1) (1970) provides in full:
 (b) It shall be an unfair labor practice for a labor organization or its agents
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances.
 
 
 [12]
 29 U.S.C. § 158(b)(4)(i) & (ii)(A) (1970) provides in full:
 (b) It shall be an unfair labor practice for a labor organization or its agents
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
 (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section.
 
 
 [13]
 29 U.S.C. § 158(e) (1970) provides in full:
 (e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: Provided further, That for the purposes of this subsection and subsection (b) of this section the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: Provided further, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception.
 
 
 [14]
 IOMMP contended that section II(2) of the standard form contract would not have required replacement under the circumstances presented. The ALJ rejected this argument, and we subscribe to his analysis. 224 N.L.R.B. at 1635
 
 
 [15]
 The second set of signs announced merely, "We are not claiming any right to the jobs . . . ." See text, supra at --- of --- U.S.App.D.C., at 901 of 575 F.2d
 
 
 [16]
 Captain Holdeman played a very active role in IOMMP activities with respect to Cove at this time. Transcript (Tr.) at 74, App. at 59; Tr. at 76, App. at 61; Tr. at 97-98, App. at 81-82
 
 
 [17]
 Further evidence is provided by the second set of picket signs. The claim that the Lawrence owners were bound by their "common-law contractual obligations" appears to be an attempt to enforce the "subsidiary and affiliate" clause. Such enforcement would appear to contemplate a claim for more than mere wages. 224 N.L.R.B. at 1633-34 & n.10
 
 
 [18]
 See G.C. Exh. 11, App. at 437-40
 
 
 [19]
 The ALJ's decision in Westchester Marine Shipping Co. came on January 17, 1975. 219 N.L.R.B. 26 (1975). The decision of the Board was issued on July 9, 1975, id., and the decision of the Fifth Circuit was given on September 27, 1976
 
 
 [20]
 The decision of the Fifth Circuit in Westchester Marine Shipping Co. was given on September 27, 1976. The decision of the Board in the instant case came on June 23, 1976
 
 
 [21]
 The "employee" members are, for the most part, deckhands and cooks on small vessels. See Brief for Petitioner at 9. See also Westchester Marine Shipping Co., 539 F.2d at 556 n.1
 
 
 [22]
 It is to be noted that the section 8(b) restraints are only a portion of a more complicated regulatory scheme. In addition to being relatively more restrained than unions without employees, IOMMP is also relatively more protected in that it gains certain protections offered under section 8(a), 29 U.S.C. § 158(a) (1970). See Westchester Marine Shipping Co., 539 F.2d at 556; Int'l Org. of Masters, Mates & Pilots v. NLRB (Marine & Marketing Int'l Corp.), 159 U.S.App.D.C. 11, 14, 486 F.2d 1271, 1274 (1973) (per curiam), cert. denied, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974)
 
 
 [23]
 See note 5 supra