486 F.2d 1271
 84 L.R.R.M. (BNA) 2439, 159 U.S.App.D.C. 11,
72 Lab.Cas. P 13,990
 INTERNATIONAL ORGANIZATION OF MASTERS, MATES AND PILOTS,
INTERNATIONAL MARINE DIVISION, ILA, AFL-CIO and
Union de Trabajadores de Muelles y Ramas
Anexas, Local 1740.
ILA-AFL-CIO, Petitioners
v.
NATIONAL LABOR RELATIONS BOARD, Respondent Marine &
Marketing International Corporation, Intervenor
 No. 72-1595.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 22, 1973.
Decided Oct. 4, 1973.
Rehearing Denied Nov. 30, 1973.
 
 Burton M. Epstein, New York City, for petitioners. Seymour M. Waldman, New York City, and Julian H. Singman, Washington, D. C., were on the brief for petitioners.
 Joseph C. Thackery, Atty., N. L. R. B., with whom Marcel Mallet-Prevost, Asst. Gen. Counsel at the time the brief was filed, and John D. Burgoyne, Atty., N. L. R. B., were on the brief, for respondent.
 Alan A. Bruckner, Miami, Fla., entered an appearance for intervenor.
 Before BAZELON, Chief Judge, and WRIGHT and MacKINNON, Circuit Judges.
 PER CURIAM:
 
 
 1
 Until November 1970 the container vessel Floridian was operated by South American Caribbean Lines (SACAL) on runs between Miami, Florida and San Juan, Puerto Rico. The ship's master and three mates were represented by petitioner International Organization of Masters, Mates and Pilots (MM&P). Engineering officers were represented by Marine Engineers Beneficial Association (MEBA) and unlicensed seamen by the Seafarers International Union (SIU). SACAL went bankrupt in November 1970 and the Floridian was decommissioned and put under Government supervision in Norfolk, Virginia. In March 1971 a new company, Marine & Marketing International Corporation (the company), was formed for the purpose of recommencing operations.
 
 
 2
 Instead of filling the Floridian's crew through the same unions whose members had previously serviced the vessel, the company signed a prehire agreement with MEBA covering all licensed deck officers and engineers. The motive behind this change was apparently not any dissatisfaction with the performance of the former MM&P deck officers. Rather, the new arrangement was financially beneficial to the company as MEBA agreed to elimination of one engineering job and SIU, which continued as representative of the unlicensed seamen, agreed to elimination of three seaman's jobs. This arrangement, combined with certain changes in the wage structure effected by the shift to MEBA, evidently saved the company about $100,000 peryear.
 
 
 3
 Pursuant to the prehire agreement, a new master and three new mates, all MEBA members, were hired and reported at Norfolk to prepare the Floridian for its first sailing. While the vessel was still at Norfolk, a representative of MM&P contacted the company's president, Eduardo Garcia, and asked when he was going to order officers for the vessel. Garcia thereupon informed the MM&P representative that the company already had made arrangements with MEBA for officers. The MM&P representative, according to Garcia, said the company was "making a big mistake" and, since MM&P was now affiliated with the International Longshoremen's Association,[1] there could be "some serious consequences." Garcia later met with the president of MM&P, who said the officer jobs belonged to MM&P by tradition as MM&P officers had manned the Floridian since it was first constructed. The MM&P president also told Garcia that he would rather see the vessel laid up than be operated by MEBA.
 
 
 4
 Despite these threats, the Floridian set sail from Norfolk to Miami to take on cargo for its first voyage under new management. At the pier in Miami the former captain and two former mates, all members of MM&P, picketed the vessel. The picket signs indicated that MM&P was affiliated with the International Longshoremen's Association (ILA), and members of a Miami local of ILA, not charged herein, observed the picket line and refused to load the ship. The company obtained a temporary restraining order in state court, the ship was loaded, and it set sail for San Juan. When the ship arrived there the same officers who had picketed in Miami appeared again, carrying the same picket signs except that they were now written in Spanish. Members of petitioner Local 1740, Union de Trabajadores de Muelles y Ramas Anexas, ILA, on instructions from their union, refused to cross the picket line. The vessel remained unloaded for six weeks until an injunction stopped the picketing.
 
 
 5
 The Board found that MM&P and Local 1740 committed an unfair labor practice under Section 8(b)(1)(B) of the National Labor Relations Act, 29 U.S.C. Sec. 158(b)(1)(B) (1970), which provides: "It shall be an unfair labor practice for a labor organization or its agents * * * to restrain or coerce * * * an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." We decline petitioners' invitation to set aside that finding.
 
 
 6
 * It is conceded by all parties that MM&P's actions come within the literal purview of the statutory language. The admitted purpose of the picketing was to pressure the company to break its contract with MEBA, fire the new MEBA master and mates, and rehire the former MM&P master and mates. The Board was obviously correct in concluding that the master and mates are representatives of the employer for the adjustment of grievances. Therefore, under the statutory language the picketing was intended to coerce the employer in the selection of his grievance adjusting representatives.
 
 
 7
 Petitioners argue, however, that when Congress enacted Section 14(a) of the Act, 29 U.S.C. Sec. 164(a) (1970), and thereby deprived supervisors (including grievance adjusters[2]) of the protections of the Act, Congress intended to allow supervisors to resort to self-help to protect their interests, as they concededly did here. On this approach Section 8(b)(1)(B) would be inapplicable to the picketing here, provided petitioners are not a labor union protected by the Act and therefore subject to its restrictions. The legislative history may well be read as evidencing a congressional purpose to permit supervisors to resort to self-help. See, e. g., 1 Legislative History of the Labor Management Relations Act, 1947, 613 (1948); Cox, Some Aspects of the Labor Management Relations Act, 1947, 61 Harv.L.Rev. 1, 4-5 (1947). Section 8(b), by its terms, applies only to "a labor organization or its agents * * *." A union composed solely of supervisors is not a "labor organization" as that term is defined in the Act. See 29 U.S.C. Sec. 152(5) (1970). It has no statutory "employees." See 29 U.S.C. Sec. 152(3). Such a union, therefore, cannot commit an unfair labor practice under any of the subsections of Section 8(b), including Section 8(b)(1)(B).
 
 
 8
 The main difficulty with MM&P's position in the present case is that it admittedly is a "labor organization" under the Act. Indeed, our own court has recently held that, because MM&P has certain locals containing statutory "employees," it constitutes a "labor organization" subject to the restrictions of Section 8(b). See Int. Org. of Masters, Mates & Pilots v. N.L.R.B., 122 U.S.App.D.C. 74, 80, 351 F.2d 771, 777 (1965).
 
 
 9
 Nor do we think it significant that in this particular instance MM&P's efforts were directed on behalf of workers all of whom were supervisors. As Judge Friendly has said, it may be that exempting unions composed solely of supervisors from Section 8(b) was considered by Congress as a "quid pro quo" for having deprived them of the protections of the Act."But the legislative history is far from being so definite or persuasive as to justify our reading the Act, in a manner opposed to its plain language, so as to permit a union in which 'employees participate' to engage in acts branded as unfair labor practices by Sec. 8(b) simply because the workers on whose behalf the union was acting are all supervisors."
 
 
 10
 National Marine Engineers Beneficial Ass'n v. NLRB, 2 Cir., 274 F.2d 167, 173 (1960).
 
 
 11
 At first glance it might seem that this interpretation of the Act produces a rather arbitrary result, since the participation of "employees" in MM&P here has no real relevance to the facts of the present case. But under the Act this interpretation works in favor of MM&P as well as against it. Because it is a "labor organization" MM&P obtains certain statutory protections. For example, Section 8(a)(2), 29 U.S.C. Sec. 158(a)(2), makes it an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it * * *." (Emphasis added.) Similarly, Section 8(a)(3), 29 U.S.C. Sec. 158(a)(3), makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *." (Emphasis added.) MM&P would forfeit the protections of these provisions were it a union composed solely of supervisors and hence not a "labor organization."
 
 
 12
 Therefore, even though we agree with the general proposition that Congress intended to permit supervisors to resort to self-help, a supervisors' union cannot have it both ways. If it allows statutory "employees" to participate, it becomes a "labor organization" entitled to the protections given such organizations and subject to the restrictions imposed by Section 8(b) on such organizations. If it does not allow any "employees" to participate, it is freed of any responsibilities under Section 8(b) at the price of forfeiting the protections of Section 8(a).
 
 II
 
 13
 Petitioners next contend that, even if they are subject to its restrictions, Section 8(b)(1)(B) was never intended to reach the picketing that took place here. They argue that Section 8(b)(1)(B), so far as it pertains to grievance adjusters, is concerned solely with attempts by a labor organization to change the person utilized by the employer to adjust the grievances of members of that same organization. For example, there would be an unfair labor practice under Section 8(b)(1)(B) here if SIU attempted to coerce the selection of the master and mates since the unlicensed seamen represented by SIU have their grievances adjusted by the master and mates.
 
 
 14
 We have examined the legislative history with care, and there is some evidence that Congress' primary concern was with situations falling within petitioner's interpretation of the Act. See 2 Legislative History, supra, at 1012, 1077. But we have found nothing showing that Congress intended not to reach conduct of the sort that took place in this case-conduct which all parties agree comes within the statute's literal scope. If anything, Congress simply did not address itself to the specific problem that has arisen here, probably because it assumed that supervisors wanting to engage in this kind of picketing would avail themselves of the opportunity not to be classified as a "labor organization" and thus be free of all the restraints of Section 8(b).
 
 
 15
 While we are aware that labor legislation does not readily adapt itself to the "plain meaning" school of jurisprudence, see, e. g., National Woodwork Manufacturers Assn v. NLRB, 386 U.S. 612, 619, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), we believe several factors militate against judicially creating an exception that would immunize MM&P's conduct here. First, petitioners concede in their brief that if the company's desire to deal with MEBA rather than MM&P was based on a valid Section 8(b)(1)(B) interest, i. e., the company's interest in the supervisory skills, qualifications or loyalties of the members of the respective unions, rather than upon financial considerations, then its decision to choose one union over the other should properly be free from coercion under the statute. This would mean that in each case where a labor organization such as MM&P or MEBA sought to put its men on a vessel presently staffed with officers of the other, the legality of their picketing would depend on the employer's reasons for ultimately choosing one union rather than the other. We doubt that Congress intended any such post hoc inquiry into the employer's motives where the union's action is directly and inherently destructive of a right guaranteed in the statute-the right to be free from coercion in the selection of grievance adjusters. The coercive nature of MM&P's picketing, especially in light of MM&P's successful efforts to capitalize on its affiliation with ILA, precludes resting the legality of MM&P's picketing on an openended inquiry into the company's "real purpose" in choosing MEBA over MM&P. The company has an interest in being free from coercion from labor organizations in the selection of its grievance adjusters, no matter what its reasons for choosing one union over the other.[3]
 
 
 16
 In addition, the exception urged upon us by petitioners might well create inequitable results with respect to ensuring that all unions interested in representing the master and mates had equal resort to self-help. Suppose, for example, that MM&P's picketing had been successful at the outset, and that the company had fired the MEBA master and mates and rehired the former MM&P master and mates. One would expect that it would then be MEBA's turn to resort to self-help and picket the vessel. But under petitioners' interpretation of the statute MEBA might well be precluded from resorting to self-help. MEBA, which like MM&P is a "labor organization" subject to the restrictions of Section 8(b),[4] already represents the engineers on the Floridian, and the Board might conclude that the captain serves in some respects as a grievance adjuster for the engineers. MEBA's picketing to regain the master's position would then fall within Section 8(b)(1)(B)'s prohibitions, even under the interpretation put forth by MM&P, since MEBA would be seeking to change the person utilized by the employer to adjust the grievances of MEBA members. The inequities of this situation are obvious.
 
 
 17
 Given these factors, we think that in this area it is better to stick with the lines drawn by Congress rather than create case-by-case exceptions. Such exceptions, though conceived in an attempt to pursue congressional purposes, might well bring results which are unworkable or inequitable in practice. Congress gave MM&P the right to ignore Section 8(b) if it gives up the status of a "labor organization." Given MM&P's refusal to take advantage of that opportunity, there is little this court can or should do to limit the scope of Section 8(b) as applied to petitioners.
 
 III
 
 18
 Finally, with respect to Local 1740, there was substantial evidence before the Board to support the conclusion that it engaged in joint, concerted action with MM&P, and that Local 1740 members did not simply honor a picket line at their place of work. At the time of the events herein, MM&P was in the process of merging with ILA. Not only was this affiliation spelled out in the picket signs carried by MM&P members, but an ILA agent had warned the company's president that the local would support MM&P in the dispute, under direction from ILA's New York headquarters.
 
 
 19
 Accordingly, the petition for enforcement is granted and the petition for review is denied.
 
 
 20
 So ordered.
 
 BAZELON, Chief Judge, dissenting:
 
 21
 The central issue in this case is whether Section 8(b)(1)(B) of the National Labor Relations Act[1] prohibits supervisor-employers from engaging in peaceful picketing to protest an employer's actions, when the protest is directed solely to the protection of the supervisors' employment interests and in no way implicates the interests of the employer's rank-and-file employees. The majority agrees with the NLRB that the Section does indeed extend to such a protest, so long as the supervisors-who are not, of course, statutory "employees" themselves[2]-are members of a union to which statutory employees belong. It holds that this is so even though none of the union's members is a rank-and-file employee of the employer whose actions the supervisors protest. I cannot agree.
 
 
 22
 Section 8(b)(1)(B) provides that it is "an unfair labor practice for a labor organization . . . to restrain or coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." For the majority, the proper result in this case follows from the statutory language as a matter of simple logic: (1) Because some of its locals have statutory employees as members, the petitioner International Organization of Masters, Mates and Pilots (MM&P) is a "labor organization" within the meaning of the Act.[3] (2) Supervisor-members of MM&P attempted, by peaceful picketing, to "coerce" an employer into substituting them for the master and mates hired under an agreement with another union. (3) The master and mates are representatives of the employer for the adjustment of grievances. The syllogism is complete. Since MM&P attempted to coerce an employer in his choice of grievance adjustment representatives, the Board was correct in deciding that MM&P had committed an unfair labor practice.
 
 
 23
 I do not fault the majority's logic. But in defining the premises from which its logical exercise proceeds, the majority has, I think, allowed itself to be led into a cul de sac against which the Supreme Court has repeatedly warned: "It is a 'familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers."'[4] Moreover, the Court has said, this rule has particular force in the construction of labor legislation-legislation that is, "to a marked degree, the result of conflict and compromise between strong contending forces and deeply held views on the role of organized labor in the free economic life of the Nation and the appropriate balance to be struck between the uncontrolled power of management and labor to further their respective interests."[5]
 
 
 24
 In short, the proper scope of Section 8(b)(1)(B)'s prohibition cannot be deduced from the statutory language alone. Our reading of the language must be informed by Congress' intent in enacting the prohibition, as fairly discerned from the relevant legislative materials. And our inquiry must attend to the place of the section in the complex of statutory provisions that concern the relationship between employers and supervisors.[6]
 
 
 25
 The Taft-Hartley Act of 1947[7] excludes supervisors from the definition of the term "employee," enabling employers to condition supervisors' employment on nonmembership in unions and nonparticipation in union affairs. Nevertheless, the law does not ban supervisors from wholly supervisory unions or from unions including, or even dominated by, rank-and-file employees. On the contrary, Section 14(a) of the Act[8] specifically provides that "[n]othing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization . . . ."[9]
 
 
 26
 But while preserving supervisors' rights to become and remain union members, the Act denies to supervisors the protections it affords to rank-and-file employees. Supervisors may not resort to federal and state labor relations boards to compel employer recognition, good faith bargaining, and nondiscriminatory treatment. They are, instead, left "to seek redress in self-help" for their economic and organizational grievances:[10]
 
 
 27
 The Taft-Hartley Act changes, while they do not outlaw foremen's unions, leave both foremen and employers to their economic weapons-the foremen to strikes and picketing to compel recognition, the latter to discriminatory discharges, espionage and blacklists to combat efforts to organize.[11]
 
 
 28
 The Board's decision in this case restricts the power of supervisors to resort to self-help-a power that Congress intended them to retain-so long as they belong to a union containing statutory employees and so long as their positions involve collective bargaining or grievance adjustment functions. In effect, it places a tax on supervisors' right to remain members of employee unions, a right that Section 14(a) specifically preserves.
 
 
 29
 I find nothing in the legislative history of Section 8(b)(1)(B) to support, or even favor, a conclusion that Congress intended it so to restrict supervisors' rights. On the contrary, the legislative history makes clear that Congress was concerned with an entirely different problem. The Section was intended to prevent efforts by employee unions to coerce employers into choosing, as collective bargaining and grievance adjustment representatives, persons sympathetic to the union's rank-and-file members, rather than persons loyal to the employer.[12] Consistently with this purpose, the Board has extended the Section to include employee union attempts, by discipline or otherwise, to force its supervisor members to perform collective bargaining or grievance adjustment functions in a manner favorable to the union.[13] Before this case, however, the Board has never attempted to apply Section 8(b)(1)(B) to a union that neither represented, nor aspired to represent, the employer's rank-and-file employees. And the reason for this is clear: in such circumstances, the purpose that Congress intended the Section to achieve is simply not implicated.
 
 
 30
 I would hold that a supervisory union is not a "labor organization" within the ambit of Section 8(b)(1)(B) unless it represents the rank-and-file employees of the supervisors' employer. I think this the only holding consistent with Congress' intent in enacting the Section and with the proper place of the Section in Congress' scheme for dealing with supervisor-employer relations. There is, however, another consideration that strongly militates in favor of this conclusion in this case. The Board has decided that the peaceful picketing in which MM&P's members engaged constituted an unfair labor practice. But the Supreme Court has consistently said that, before ascribing to Congress a purpose to outlaw peaceful picketing, there must be "the clearest indication in the legislative history' . . . that Congress intended to do so as regards the particular ends of the picketing under review."[14] This rule of construction, grounded as it is in First Amendment guarantees,[15] precludes, I think, the wooden construction of Section 8(b)(1)(B) that the Board has adopted and the majority approves. The legislative history of the Section quite simply lacks any indication that it was intended to prohibit supervisors from peaceful picketing in protest of their employer's actions, at least when their protest does not even arguably favor the interests of their employer's rank-and-file employees.
 
 
 31
 Despite these considerations, the majority insists that the Act puts those supervisors who have collective bargaining or grievance adjustment functions to a choice. They may either join wholly supervisory unions, to which the prohibitions of the Act are inapplicable, or they must abide Section 8 restrictions on their efforts at self-help. As a practical matter, I doubt that this leaves supervisors or their unions with any real choice at all.[16] In any case I find it clear that no such choice was contemplated by Congress. At most, the purpose of the Act favors a more narrowly drawn, more rational rule: a union may engage in self-help to protect the employment interests of its supervisormembers so long as the union does not at the same time represent rank-and-file employees of the supervisors' employer.
 
 
 32
 I grant that this rule would, as the majority points out, work some inequity, since unions that represent both supervisors and their subordinates would be restricted in their resort to self-help. In that circumstance, however, Congress' purpose in enacting Section 8(b)(1)(B) is at least arguably involved. I do not understand how avoiding this lesser inequity justifies adopting a construction of the Section that leads to greater inequity-inequity that is, moreover, entirely unjustified by the interests Congress intended the Section to protect.
 
 
 33
 I would grant the petition for review, reverse the decision of the Board, and deny enforcement of the order. I respectfully dissent.
 
 
 
 [1]
 In fact, on March 31, 1971 MM&P and ILA announced that the Executive Board of ILA had decided to issue a charter of affiliation to MM&P. At the time of the trial examiner's hearing herein a ratification ballot aimed at approval of the Executive Board's resolution was being processed but had not yet been completed
 
 
 [2]
 "The term 'supervisor' means any individual having authority, in the interest of the employer, * * * to adjust [employee] grievances * * *." 29 U.S.C. Sec. 152(11) (1970)
 
 
 [3]
 Nothing to the contrary is implied in Hanna Mining Co. v. District 2, Marine Engineers Beneficial Assn, 382 U.S. 181, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965). There MEBA picketed a vessel, claiming that the employer unfairly refused to recognize the union as the bargaining representative of the vessel's engineers. The Supreme Court held that state court jurisdiction to enjoin the picketing was not preempted by federal law as the conduct was not arguably prohibited by Section 8(b). While this may constitute an implicit holding that the picketing there did not violate Sec. 8(b)(1)(B), an obvious difference distinguishes the Hanna picketing from that which took place in the instant case. In Hanna the picketing was not directed at having certain engineers fired and replaced, as was the case here, but rather at having MEBA recognized as the bargaining representative of then employed engineers, a majority of whom allegedly desired MEBA as their representative
 
 
 [4]
 See National Marine Engineers Beneficial Assn v. NLRB, 2 Cir., 274 F.2d 167 (1960)
 
 
 [1]
 29 U.S.C. Sec. 158(b)(1)(B) (1970)
 
 
 [2]
 See 29 U.S.C. Sec. 152(3) (1970)
 
 
 [3]
 See 29 U.S.C. Sec. 152(5) (1970); Int'l. Org. of Masters, Mates & Pilots v. NLRB, 122 U.S.App.D.C. 74, 351 F.2d 771 (1965)
 
 
 [4]
 National Woodworkers Mfrs. Ass'n. v. NLRB, 386 U.S. 612, 619, 87 S.Ct. 1250, 1255, 18 L.Ed.2d 357 (1967), quoting Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226 (1892)
 
 
 [5]
 Local 1976, United Brotherhood of Carpenters v. Labor Board, 357 U.S. 93, 99-100, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186 (1958); see National Woodworkers Mfrs. Ass'n. v. NLRB, supra, 386 U.S., at 619, 87 S.Ct. 1250
 
 
 [6]
 See NLRB v. Allis Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967)
 
 
 [7]
 Labor Management Relations Act Secs. 1 et seq., 29 U.S.C. Secs. 141-187 (1970), amending 49 Stat. 449 (1935)
 
 
 [8]
 29 U.S.C. Sec. 164(a) (1970)
 
 
 [9]
 See Comment, The Role of Supervisors in Employee Unions, 40 U.Chi.L.Rev. 184, 187 (1972)
 
 
 [10]
 1 Legislative History of the Labor Management Relations Act of 1947 at 613 (1947)
 
 
 [11]
 Cox, The Labor-Management Relations Act, 61 Harv.L.Rev. 1, 5 (1947); see Smith, The Taft-Hartley Act and State Jurisdiction Over Labor Relations, 46 Mich.L.Rev. 593, 600 (1948)
 
 
 [12]
 See, e. g., 93 Cong.Rec. 3953 (1947), 1 Legislative History, supra note 7, at 1012 (remarks of Senator Taft). For a full discussion of the legislative history of the Section and its proper construction, see this court's recent en banc decision in International Brotherhood of Electrical Workers v. NLRB, 159 U.S.App.D.C. ____, at __________, 487 F.2d 1143, at 1152-1159 (1973)
 
 
 [13]
 E. g., San Francisco-Oakland-Mailers' Union No. 18, 172 NLRB No. 252 (1968)
 
 
 [14]
 NLRB v. Fruit & Vegetable Packers, Local 760, 377 U.S. 58, 62-63, 84 S.Ct. 1063, 1066, 12 L.Ed.2d 129 (1964), quoting NLRB v. Drivers Local Union, 362 U.S. 274, 284, 80 S.Ct. 706, 4 L.Ed.2d 710 (1961). (Emphasis added)
 
 
 [15]
 Id
 
 
 [16]
 The majority contends that, in return for accepting Section 8(b)'s restrictions, supervisory unions containing statutory employees receive certain protections under Section 8(a). But the quid is by no means equal to the quo. For example, a supervisor who becomes a member of a union containing statutory employees might be discharged by his employer and replaced. Since the supervisor is not himself a statutory employee, he would not be able to get redress from the Board on the ground that he had been discriminatorily dismissed in violation of Section 8(a)(3). Yet, under the majority's construction of 8(b)(1)(B), any attempt by the union or the supervisor himself to protest his dismissal would constitute an unfair labor practice. Thus, while the supervisors' union may receive certain statutory protections as a labor organization, the supervisors themselves do not