**NEWPORT TANKERS CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**International Organization of Masters, Mates and Pilots, Intervenor,**

**Cove Shipping, Inc., Point Shipping Corp., California and Hawaiian Sugar Co., Pacific-Gulf Marine, Inc. and Zapata Bulk Transport, Inc., Amicus Curiae.**

No. 77–2425.

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1978.

Decided May 10, 1978.

Warren M. Davison, Washington, D. C. (Earle K. Shawe, Shawe & Rosenthal, Baltimore, Md., on brief), for petitioner.

Elinor Hadley Stillman, Washington, D. C. (Collis Suzanne Stocking, Attys., N.L.R.B., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., on brief), for respondent.

Jerry D. Anker, Washington, D. C. (Wald, Harkrader & Ross, Washington, D. C., Marvin Schwartz and Burton M. Epstein, New York City, on brief), for intervenor International Organization of Masters, Mates and Pilots.

Martin C. Seham, Los Angeles, Cal., Andrew E. Zelman, New York City, Brobeck, Phleger & Harrison, Los Angeles, Cal., Surrey, Karasik, Morse & Seham, New York City, on brief), for amicus curiae.

Before WINTER, Circuit Judge, FIELD, Senior Circuit Judge, and WIDENER, Circuit Judge.

WINTER, Circuit Judge:

Notwithstanding the contrary view of the administrative law judge, a majority of the Board in a split decision ruled that International Organization of Masters, Mates and Pilots (MMP) did not violate § 8(b)(1)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(B), when it picketed the S/T Achilles to require her operators, Newport Tankers Corporation (Newport), to employ an additional third mate. The Board therefore dismissed the complaint against MMP. On Newport's petition for review, we conclude that § 8(b)(1)(B) was violated. We therefore set aside the Board's order and remand the case to the Board for further proceedings.

## I.

On April 13, 1976, the S/T Achilles docked in Chesapeake, Virginia for the purpose of loading grain for shipment to the Soviet Union. The ship's licensed deck officers and engineers were members of the Marine Engineers Beneficial Association (MEBA), while its unlicensed seamen belonged to the Seafarers International Union (SIU). It is undisputed that the second and third mates of the ship were vested with the authority to adjust grievances as part of their usual duties and that, on the specific orders of the ship's master, they exercised this authority. Indeed, the collective bargaining agreement between Newport and SIU, covering unlicensed seamen, specifically provided that grievances were to be presented "to their superior officers," among which were, of course, the second and third mates.

On April 14, the S/T Achilles was picketed by members of the Offshore Division of MMP.[1] In pertinent part, the picket signs stated that:

S/S [sic] ACHILLES EMPLOYS A SECOND AND THIRD MATE NOT COVERED BY A COLLECTIVE BARGAINING AGREEMENT. THE SECOND AND THIRD MATE ARE EMPLOYED UNDER SUBSTANDARD WORKING CONDITIONS.

MMP concedes that the first sentence was erroneous, for, at the time of picketing, the Achilles' deck officers were represented by MEBA. As to the second sentence, MMP further concedes that the only "substandard" condition to which the signs referred was the condition of having to work without an additional third mate.[2] MMP's alleged purpose in picketing S/T Achilles was to force Newport to employ one additional third mate (irrespective of union membership) so as not to undercut the manning standard generally prevailing on ships manned by MMP deck officers.

As a result of the picketing, employees at the grain elevator from which the grain was to be loaded refused to load grain aboard the Achilles. Picketing continued until April 16, when it was enjoined by a United States district court in an admiralty trespass proceeding. On May 3, an injunction was entered in district court, prohibiting MMP from engaging in further picketing of the S/T Achilles pending resolution of the instant unfair labor practice charge.

In filing the charge, the general counsel contended that MMP's picketing violated § 8(b)(1)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(B),[3] because a third mate is a grievance adjustor and picketing to *require* the employment of a second third mate necessarily interferes with an operator's selection of its representatives for the purpose of adjustment of grievances.

The administrative law judge, relying upon prior decisions of the Board which had examined the organizational structure of MMP, concluded that MMP was a "labor organization" within the meaning of the Act,[4] and that the picketing about which complaint was made violated § 8(b)(1)(B) because picketing to cause the hiring of an *additional* licensed deck officer interfered with Newport's right freely to designate its supervisors. The administrative law judge rejected the distinction pressed upon him that the hiring of an *additional* licensed deck officer, unlike picketing to accomplish the *replacement* of existing officers, was not proscribed by § 8(b)(1)(B). A majority of the Board reached a contrary conclusion. The majority held that since the object of the picketing was to have Newport hire an *additional* third mate of its own choosing, whether or not a member of MMP, and not to replace a third mate previously chosen, the picketing was not in violation of the Act. *International Organization of Masters, Mates and Pilots (Newport Tankers Corporation)*, 233 N.L.R.B. No. 42 (November 7, 1977).

## II.

Since the late 1950's, MMP and MEBA have been engaged in vigorous competition to represent licensed deck officers on American merchant vessels. From the stand-

---

**1.** The Offshore Division is the largest organizational component of MMP and is comprised solely of shipboard supervisory personnel.

**2.** The standard contract between ship operators and MEBA provides for a complement of a master, a first mate, a second mate and *one* third mate. The standard contract between ship operators and MMP, on the other hand, provides for *two* third mates.

**3.** In pertinent part, this section provides:

It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce . . . (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances . . . . .

**4.** Although MMP's principal membership is licensed deck officers employed by the U.S. maritime industry, it has approximately 250 "employee" members—that is, cooks and deckhands on small inland vessels. MMP, an intervenor in the proceedings before us, does not contest that it is a "labor organization" within the meaning of the Act.

point of most ship operators, MEBA has the competitive advantage because of several contract provisions (including the decreased manning standard) which favor operators. As MEBA has become increasingly successful in its representational efforts, MMP has resorted to picketing ships whose operators have signed contracts with MEBA.

Since 1972, the District of Columbia Circuit and the Fifth Circuit have held in three separate cases that MMP's picketing activities in this regard were in violation of § 8(b)(1)(B). *See International Organization of Masters, Mates & Pilots v. N.L.R.B. [Marine & Marketing Int'l]*, 159 U.S.App. D.C. 11, 486 F.2d 1271 (1973), *cert. denied*, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974); *International Organization of Masters, Mates & Pilots v. N.L.R.B. [Westchester Marine Shipping]*, 539 F.2d 554 (5 Cir. 1976), *cert. denied*, 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977); *International Organization of Masters, Mates & Pilots v. N.L.R.B. [Cove Tankers]*, 188 U.S.App.D.C. ——, 575 F.2d 896 (D.C.Cir.1978). In each of these cases, MMP picketed vessels manned by MEBA deck officers for the purpose of having these deck officers *replaced* by MMP members. In each the basis of decision, briefly stated, was that MMP, because it has members who are "employees" within the meaning of the Act, is a "labor organization" for purposes of § 8(b)(1)(B). Deck officers are supervisors who, in their daily activities, represent the employer in adjusting grievances of unlicensed seamen. As a consequence, when MMP, a statutory "labor organization," pickets MEBA-manned vessels for the purpose of persuading employers to select MMP deck officers, it comes within the literal prohibition of § 8(b)(1)(B).[5]

The instant case differs from cited cases only in the purpose of the picketing. Here the objective was to require Newport to employ a second third mate, whether or not he was a member of MMP, but not to replace the existing third mate. We agree with the administrative law judge that the distinction between the picketing here and that in the previously decided cases is a distinction without a difference. The objective of the statute is to proscribe restraint or coercion of an employer in the selection of his representatives for the purpose, *inter alia*, of the adjustment of grievances. There is, of course, a difference of degree in the restraint or coercion of an employer by picketing to accomplish the replacement of a given employee rather than to dilute the authority of that employee by requiring that at least some of his duties be performed by others. But aside from degree, we think that picketing to dilute the authority of an employee to adjust grievances is no less within the proscription of the statute.

The correctness of the conclusion we reach seems to have been recognized in *Laborers' International Union of North America, Local 478 (International Builders of Florida, Inc.)*, 204 N.L.R.B. 357, *enforced*, 164 U.S.App.D.C. 101, 503 F.2d 192 (1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1122, 43 L.Ed.2d 396 (1975). There the picketing was to require the employer to hire a certain Davis as an assistant foreman in lieu of or under a certain Wilson who was foreman. In holding the picketing violated

---

**5.** *Marine and Marketing Int'l*, the first of these cases, was a split decision. Chief Judge Bazelon dissented from enforcement of the Board's order. In essence, his theory was that a union principally of supervisors is not a "labor organization" for purposes of § 8(b)(1)(B) even though it has some employee members, when it pickets an employer to affect the employer's choice of its supervisory personnel where none of the union's employee members are employees of the employer so picketed. 159 U.S.App. D.C. at 16–19, 486 F.2d at 1276–79. While Judge Bazelon's theory seemingly has some support in the legislative history of

§ 8(b)(1)(B), *see Florida Power & Light v. Electrical Workers*, 417 U.S. 790, 803–05, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974), it has not been advanced by either the intervenor MMP or any of the other parties to this appeal. We therefore do not consider it. For the purpose of deciding this case, we assume the correctness of the conclusion reached by the majority in *Marine and Marketing Int'l* and the unanimous courts in *Westchester Marine Shipping* and *Cove Tankers*, and decide whether the picketing which occurred here also fell within the literal application of § 8(b)(1)(B).

§ 8(b)(1)(B), the Board said, "[w]e are in agreement . . . that [the union], by insisting that Davis be hired as foreman *either in Wilson's place or under Wilson*, violated . . . the Act." 204 N.L.R.B. at 357. (Emphasis added.) We therefore cannot read *Laborers' Int'l*, as did the majority of the Board, as resting solely upon the union's attempt to require the employment of a particular individual, i. e. Davis. But even if it is so read, we agree with the dissenting member of the Board in the instant case who said that one cannot read *Marine and Marketing, Westchester Marine*, and *Cove Tankers* and not recognize the "fact of life" that the actual object of MMP's picketing was the eventual replacement of the ship's deck officers with MMP members.[6]

For these reasons, the order of the Board vacating dismissal of the complaint must be set aside. Under applicable law as we have declared it, the picketing by MMP was in violation of § 8(b)(1)(B), and we therefore remand the case to the Board for further proceedings in accordance with this opinion.

*VACATED AND REMANDED.*

**6.** This same conclusion was reached in the Fifth Circuit's decision in *Westchester Marine Shipping, supra*. In *Westchester*, the Board had not only ordered the cessation of picketing for replacement of MEBA personnel but also (in stark contrast to its position in the instant case) picketing for other objectives, including increased manning. In enforcing this broad order, the court made the following observations:

> For Westchester and Pyramid to have met MM&P labor standards, particularly the manning requirement in the standard MM&P contract, would have necessitated a breach of the then-effective collective bargaining contract between the employers and MEBA. Recognition of MM&P by the employers and execution of an appropriate collective bargaining agreement between those employers and MM&P would similarly have forced a breach of the existing contract. The Board asserts that MM&P's attainment of any or all of the sought-after objectives of its picketing would have compelled MEBA to forbid its

members from serving on the Ultramar or the Sugar Islander, and we have no difficulty accepting this assertion. Maintaining its competitive edge in the fight to represent licensed deck officers on ocean-going vessels turns largely on the ability of MEBA to offer employers an economical contract, which will in turn permit effective competition between United States and foreign flag vessels. Consequently, even if the only objective in fact attained were adherence to MM&P labor standards, the threat to MEBA would still be clear.

539 F.2d at 561.

It is clear to us, as it obviously was to the Fifth Circuit, that MMP's ultimate objective is to supplant MEBA. Whether the immediate picketing objective is wholesale replacement of existing personnel or a more subtle attempt to force the employer into a breach of the existing contract with MEBA, the ultimate effect is equally coercive of Newport's right to select its grievance adjusters.