987 F.2d 799
 142 L.R.R.M. (BNA) 2774, 300 U.S.App.D.C.
135, 61 USLW 2573,
124 Lab.Cas. P 10,580
 INLAND LAKES MANAGEMENT, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
District 2, Marine Engineers Beneficial
Association-Associated Maritime Officers, AFL-CIO,
Intervenor.
 No. 92-1036.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 4, 1993.
Decided March 9, 1993.
 
 Petition for Review of an Order of the National Labor Relations Board.
 William F. Kershner, Berwyn, PA, with whom John P. Monaghan, Philadelphia, PA, was on the brief, for petitioner.
 Nancy B. Hunt, Attorney, N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Collis S. Stocking, Supervisory Attorney, N.L.R.B., Washington, DC, were on the brief, for respondent.
 Joel C. Glanstein, Rockville Centre, NY, with whom Joan Torzewski, Toledo, OH, was on the brief for intervenor Dist. 2, Marine Engineers Beneficial Association-Associated Maritime Officers, AFL-CIO.
 Before WALD, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 Inland Lakes Management, Inc. ("Inland") petitions for review of a decision by the National Labor Relations Board ("NLRB" or "Board") that the picketing conducted by District 2, Marine Engineers Beneficial Association-Associated Maritime Officers, AFL-CIO ("MEBA" or "Union") did not violate § 8(b)(1)(B) of the National Labor Relations Act ("NLRA") which makes it unlawful for a union "to restrain or coerce ... an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances...." Inland asserts that the Board ignored clear record evidence that the objective of the picketing was to reinstate striking chief engineers, who were found by the Board to be § 8(b)(1)(B) representatives, in violation of the NLRA. Further, Inland argues that even if MEBA's picketing was only for recognition or collective bargaining purposes, the Board erred as a matter of law in deciding that picketing for such purposes did not violate § 8(b)(1)(B) of the NLRA.
 
 
 2
 We reject Inland's first argument because the NLRB's conclusion that the Union's picketing did not have a reinstatement objective is rational and is supported by substantial evidence in the record as a whole. As to the second contention, although prior Board decisions in the 1970s appeared at times to preview an emerging Board position that picketing for recognition and collective bargaining of a unit that included grievance-adjusting representatives amounted per se to direct coercion in violation of § 8(b)(1)(B), the Board in fact never explicitly adopted such a rule. Here the Board has distinguished its prior decisions and ruled that picketing for recognition or collective bargaining of a unit including employer representatives does not necessarily result in impermissible coercion where the union has no replacement motive and recognition and bargaining would not require the company to violate existing contracts with another union or to accept contract terms pertaining to the selection of grievance representatives. The current Board view of § 8(b)(1)(B) is a reasonable construction of that section, worthy of deference from this court. Accordingly, the petition for review is denied.
 
 I. BACKGROUND
 
 3
 Inland is a Michigan-based shipping company which hauls bulk cement in four vessels across the Great Lakes. Each vessel has a licensed chief engineer who, under a contract between Inland and the Seafarer's International Union (which represents Inland's unlicensed crew), has the authority to adjust grievances. Below the chief engineer are the first, second and third assistant engineers, who are also licensed by the Coast Guard but do not have grievance adjusting authority. On March 30, 1988, Melvin Pelfrey, executive vice president of MEBA, wrote to Inland's president James Gaskell, stating that MEBA had authorization cards from a majority of Inland's licensed engineers and demanding that Inland recognize it as the collective bargaining agent for the company's licensed engineers. Inland responded that the employees MEBA sought to represent were supervisors and therefore exempt from the NLRA, and that the company would "consider any picketing conducted by MEBA for the purpose of forcing it to recognize MEBA as the representative of its supervisory employees as unlawful under the National Labor Relations Act." On September 10, 1988, MEBA began picketing Inland with signs which stated that MEBA was on strike against Inland, named the company's four vessels and noted that MEBA had no dispute with other employers. Three of Inland's chief engineers left their ships and joined the picket line.
 
 
 4
 In October 1988, two new picket signs appeared. The first stated:
 
 ATTENTION MASTERS AND LICENSED MATES
 
 5
 Most of the engineers working on Inland Lakes vessels are SCABS. These SCABS are stealing jobs from your friends and shipmates who elected to stand up for better working standards and conditions. Please consider what the active participation of the deck officers could do. Unlike engineers, Great Lake deck officers are not available from the coast. Join us in stopping Inland Lakes Management from refusing to bargain with their officers. We can use your help--now! Talk to the pickets for details.
 
 
 6
 The second sign stated simply: "SCABS are working your friends' jobs." On November 10, 1988, Inland charged MEBA with engaging in a continuous course of conduct violative of § 8(b)(1)(B) of the NLRA by picketing and striking in order to coerce Inland to reinstate the striking chief engineers and to obtain Inland's recognition of MEBA as the collective bargaining representative of Inland's licensed engineers. At the time of the hearing before the administrative law judge ("ALJ"), the picketing was still being conducted whenever Inland's vessels came into port. The ALJ found that MEBA had not violated § 8(b)(1)(B) and the Board, over the dissent of one member, agreed with the ALJ. District 2, Marine Engineers Beneficial Ass'n-Associated Maritime Officers, AFL-CIO, 305 N.L.R.B. No. 60 (1991).
 
 II. ANALYSIS
 
 7
 Section 8(b)(1)(B) of the NLRA provides that "[i]t shall be an unfair labor practice for a labor organization or its agents ... to restrain or coerce ... an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." 29 U.S.C. § 158(b)(1)(B). The Board's conclusion that there has been no violation of the NLRA should be affirmed so long as it is "rational, and supported by substantial evidence." United Mine Workers, District 31 v. NLRB, 879 F.2d 939, 944 (D.C.Cir.1989); see also Teamsters Local Union No. 515 v. NLRB, 906 F.2d 719, 727 (D.C.Cir.1990), cert. denied, 498 U.S. 1053, 111 S.Ct. 767, 112 L.Ed.2d 786 (1991).
 
 A. Reinstatement Objective
 
 8
 Inland first contends that one of the objectives behind MEBA's picketing was to have the striking chief engineers reinstated, thereby supplanting the replacement chief engineers hired by Inland following commencement of the strike. No one disputes that picketing for such an objective violates § 8(b)(1)(B) because the reinstatement of supervisors with grievance adjustment responsibilities directly coerces the company in the selection of its grievance representative. See Maritime Overseas Corp. v. NLRB, 955 F.2d 212, 217 (4th Cir.1992); Int'l Org. of Masters, Mates and Pilots v. NLRB, 486 F.2d 1271, 1273 (D.C.Cir.1973), cert. denied, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974). However, after reviewing the record in this case, the NLRB determined that the picketing was not animated by an unlawful reinstatement objective, but instead, solely by a desire to secure recognition and collective bargaining for Inland's licensed engineers.
 
 
 9
 In arguing that the Board's determination should be overturned, Inland points to two pieces of record evidence which allegedly clearly expose the Union's reinstatement motive: the two picket signs which refer to "scabs," and certain statements made by MEBA officials before the ALJ. With regard to the two picket signs, the Board concluded that the references to "scabs" did not equate to a demand by the Union that the striking chief engineers be reinstated. The Board reasoned:
 
 
 10
 Obviously, in any strike situation, the union will vigorously oppose the employment of replacements, for such employment helps the employer to win the economic struggle by operating the business while the strikers are not earning wages. But, it is an unwarranted leap to infer from such a picket sign that the union is demanding that the strikers now displace the replacements.... [T]hat demand may occur in this case, but it has not yet done so.
 
 
 11
 305 N.L.R.B. No. 60 at 3. Similarly, the Board was not persuaded that the testimony of MEBA executive vice president Melvin Pelfrey or of MEBA staff representative Herbert Nelson provided any additional evidence of a reinstatement purpose. At a June 29, 1989 hearing, Pelfrey responded affirmatively when asked by Inland's counsel whether he "would like to have [Chief Engineer] Sinnett returned to Inland Lakes Management employ," and whether he "want[ed] to have persons like Mr. Sinnett and others returned to active employment with Inland." Likewise, when asked whether he wanted to have the striking engineers reinstated, Nelson replied: "Yes. But that is not my choice. Each man has his individual choice if he'd want to return." In the Board's view, this testimony revealed
 
 
 12
 [a]t most ... that the witness[es] "wanted" to have the strikers returned to work. Obviously, it is the "want" of every union that the strikers will one day return to work at the successful conclusion of a strike. However, ... [MEBA] had not reached the point at which it was seeking the reinstatement of the strikers. The strike was still ongoing. In these circumstances, we would not equate [MEBA's] "want" with a present objective of seeking the reinstatement of the strikers and the displacement of the replacements.
 
 
 13
 Id. at 3-4. In sum, the Board concluded: "There was no evidence that [MEBA] ever asked [Inland] for reinstatement of the striking chief engineers.... Conceivably, there could come a time when [MEBA] would end its strike and seek reinstatement of the chief engineers.... However, the critical point is that all of this is mere speculation." Id. at 2.[1]
 
 
 14
 While the picket signs and the statements made by the MEBA officials could be interpreted in more than one way, we certainly cannot say that the Board's fact-bound decision that they did not establish that the Union had a purpose in picketing other than recognition and collective bargaining is "irrational or unsupported by substantial evidence." Oil, Chem. & Atomic Workers Int'l Union v. NLRB, 362 F.2d 943, 946 (D.C.Cir.1966); cf. Maritime Overseas Corp., 955 F.2d at 217-19 (affirming Board's finding of § 8(b)(1)(B) violation where "exhaustive documentation" supported "finding that the picketing had a replacement objective," including announcements by union president that union "will succeed in restoring its membership to their rightful jobs and conditions" and members should do their "utmost to stop the flow of replacements"). Further, Inland does not specifically identify, and we cannot detect on our own, any dispositive evidence in the record that the Board failed to weigh in reaching its decision. See Hickman Harbor Serv. v. NLRB, 739 F.2d 214, 218-19 (6th Cir.1984); Maine Yankee Atomic Power Co. v. NLRB, 624 F.2d 347, 360 (1st Cir.1980); NLRB v. Huntington Hospital, Inc., 550 F.2d 921, 924 (4th Cir.1977). Accordingly, we affirm the Board's finding that MEBA did not have an unlawful reinstatement purpose in picketing.
 
 
 15
 B. Recognition and Collective Bargaining Objectives
 
 
 16
 Inland next argues that even if the picketing was undertaken solely to achieve recognition and collective bargaining, it still constitutes an automatic violation of § 8(b)(1)(B) under valid Board precedent because it "restrains or coerces" employers in the selection of their § 8(b)(1)(B) representatives. For support, Inland cites two NLRB decisions from the 1970s. First, in International Organization of Masters, Mates and Pilots v. NLRB, 219 N.L.R.B. 26, 28 (1975) ("Westchester Marine"), the Board held that § 8(b)(1)(B) prohibited picketing "with the object of causing [the employer] to replace their [grievance-adjusting] licensed deck officers ... with licensed deck officers who are members of and who are represented by [the union]; to obtain recognition as sole collective-bargaining representative of licensed deck officers; to enter into a collective-bargaining agreement; or to impose its terms and conditions of employment on the licensed deck officers." The Fifth Circuit affirmed the Board's analysis, finding that "[w]here the facts as determined by the Board disclose a case of direct coercion, ... the sweep of the statute is broad enough to prohibit picketing for replacement, recognition, a collective bargaining agreement or adherence to labor standards." 539 F.2d 554, 561 (5th Cir.1976), cert. denied, 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977). Second, in International Organization of Masters, Mates and Pilots v. NLRB, 224 N.L.R.B. 1626, 1627 (1976) ("Cove Tankers"), the Board forbade the union from picketing "with an object of causing [the employer] to replace the [grievance-adjusting] master or chief mate ...; or to obtain recognition as sole collective-bargaining representative of such officer; or to impose [the union's] terms and conditions of employment on the selection, hire, or retention of the master or chief mate." On appeal, the union urged that the Board's decision "be modified so as to permit picketing for ... non-replacement objectives," but this court refused, agreeing with the Fifth Circuit that " 'the practical effect of seeking these other objects is ... tantamount to coercion of the employers in the selection of their licensed deck officers.' " 575 F.2d 896, 907 (D.C.Cir.1978) (quoting Westchester Marine, 539 F.2d at 561). Although the Board and the reviewing courts limited their findings of § 8(b)(1)(B) violations to the particular circumstances of each case, see Cove Tankers, 224 N.L.R.B. at 1626 n. 2; Westchester Marine, 219 N.L.R.B. at 27, there is little question but that the two decisions reflected distinct movement by the Board in the direction of an absolute rule against picketing for recognition and bargaining of a unit including grievance representatives as a § 8(b)(1)(B) violation.
 
 
 17
 The Board responds on appeal[2] that these cases predate the decision of the Supreme Court in NLRB v. International Brotherhood of Electrical Workers, Local 340, 481 U.S. 573, 107 S.Ct. 2002, 95 L.Ed.2d 557 (1987) ("Royal Electric"), which, in the Board's view, narrowed the scope of § 8(b)(1)(B). Royal Electric extended the reasoning of a previous Supreme Court decision in Florida Power & Light Co. v. International Brotherhood of Electrical Workers, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974), on the subject of when internal union discipline of supervisor-members amounts to coercion of an employer's selection of grievance representatives. In Florida Power, the Board had found that the union's fining of supervisor-members who crossed the picket line during a strike to perform rank and file work violated the statute, but the Court disagreed, explaining that "a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8(b)(1)(B) only when that discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer." 417 U.S. at 804-05, 94 S.Ct. at 2744; see also American Broadcasting Cos. v. Writers Guild, 437 U.S. 411, 98 S.Ct. 2423, 57 L.Ed.2d 313 (1978) (§ 8(b)(1)(B) violation found where union fined supervisor-members for crossing picket line and engaging in supervisory duties, including grievance adjusting).
 
 
 18
 The issue in Royal Electric was whether a union could lawfully fine supervisor-members, who did not have § 8(b)(1)(B) duties, for performing work for an employer with whom the union did not have a collective bargaining agreement. The Board believed that such sanctioning of supervisors violated the statute because it limited the "reservoir" of supervisor-employees from which an employer could, in the future, select a grievance representative. 481 U.S. at 577, 107 S.Ct. at 2006; see NLRB v. Rochester Musicians Ass'n, 514 F.2d 988, 992 (2d Cir.1975) ("The rationale ... is that supervisors are viewed as a reservoir of manpower available and likely to be chosen as collective bargainers or grievance adjusters at some later date. Since union discipline could affect the supervisor's loyalty to the employer, the employer would be restricted in his choice of future representatives."). The Court disagreed, finding that the Board's theory rested on a "chain of suppositions" which could not be "reconciled with the structure of the NLRA or with the Court's limited construction of § 8(b)(1)(B) in Florida Power." Royal Electric, 481 U.S. at 586, 107 S.Ct. at 2010-11. Thus, the Court concluded that the union discipline was not an unfair labor practice because the possibility that a "supervisor might someday perform § 8(b)(1)(B) functions and that past discipline might then have an adverse effect on the performance of such duties is simply too speculative to support a finding that an employer has been 'restrain[ed] or coerce[d]' 'in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances.' " Id. at 589, 107 S.Ct. at 2012. In addition, the Court reasoned that where the union neither has nor seeks a collective bargaining relationship with the employer of the fined supervisor-members, such union discipline does not violate § 8(b)(1)(B) because there is little likelihood of coercion: "[t]he union has nothing to gain by interference with the supervisor-member's loyalty during grievance adjustment or collective bargaining; nor can the employer-representative reasonably expect that he or she will be subject to discipline for the manner in which those duties are performed in the future." Id. at 590 (emphasis in original). Because both Royal Electric and Florida Power addressed only the indirect coercion of supervisor-members through union disciplinary actions, those cases are not dispositive of the question presented here whether picketing for recognition and collective bargaining always amounts to coercion of a company's selection of § 8(b)(1)(B) representatives. Cf. Maritime Overseas Corp., 955 F.2d at 223 (declining to decide whether, in light of Royal Electric, picketing for recognition, collective bargaining and adherence to area labor standards would violate § 8(b)(1)(B)). However, we agree with the NLRB that those cases, which rejected Board decisions that had construed § 8(b)(1)(B) expansively, manifested the general view that courts must require more than incidental or speculative coercion of an employer's selection of grievance representatives to find a violation of the statute.
 
 
 19
 Next, the Board asserts that Cove Tankers and Westchester Marine are also distinguishable on the following grounds: first, that in both of those cases the supervisory employees sought to be represented by the Masters, Mates and Pilots union ("MMP") were already represented by another union and therefore granting the MMP's demands for recognition and collective bargaining would have required the employer to breach the existing contract with the other union and compelled the other union to forbid its members from serving the employer; and second, the picketing in both cases sought to have the company accept industry-wide contract terms that would severely limit the employer's choice of § 8(b)(1)(B) representatives. See Westchester Marine, 219 N.L.R.B. at 26, 539 F.2d at 558, 561; Cove Tankers, 224 N.L.R.B. at 1635-36, 575 F.2d at 900-01 n. 7, 902. Conversely, the Board argues, acceptance of MEBA's demands for recognition and bargaining would not have any direct and immediate effect on Inland's freedom to select § 8(b)(1)(B) representatives because the licensed engineers are not under contract with another union, and because MEBA's picketing was not for the purpose of gaining Inland's adherence to any particular contract terms. In other words, while some union picketing for recognition of a unit including grievance representatives will foreseeably place pressure on the employer's selection of such representatives, the Board believed that in this case there was no basis for concluding that attainment of MEBA's goals would have any impact on Inland's choice of § 8(b)(1)(B) representatives because there was no indication of what, if anything, MEBA would demand of Inland at the bargaining table. As the Board explained, Inland is " 'seeking to present, as fact, what they think the Union would seek' in the future." 305 N.L.R.B. No. 60 at 2 (quoting decision of ALJ).
 
 
 20
 An agency may of course "find that, although [a] rule in general serves useful purposes, peculiarities of the case before it suggest that the rule not be applied in that case." Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) (plurality opinion); see also NLRB v. Int'l Union of Operating Engineers, 460 F.2d 589, 604 (5th Cir.1972). Here, the Board's attempt to distinguish its prior cases, while terse, is entitled to deference.[3] The Board's decision appears, to us at least, to reflect the policy determination that its decisions in Cove Tankers and Westchester Marine should not be extended to the point that picketing solely for recognition and bargaining would automatically be deemed coercion of an employer's selection of its § 8(b)(1)(B) representatives. That judgment was within the Board's considerable discretion to interpret the NLRA.
 
 
 21
 As the Supreme Court has noted, "[t]he function of striking [the] balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." American Broadcasting Cos., 437 U.S. at 431, 98 S.Ct. at 2434-35 (internal quotation marks omitted). Indeed, so long as the agency's construction of a statutory ambiguity is reasonable, we will uphold it. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984); United Mine Workers, 879 F.2d at 944. Here, we find the Board's present unwillingness to say that in every case a union's picketing for recognition and collective bargaining violates § 8(b)(1)(B) is an "acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory section[ ]." NLRB v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 341, 98 S.Ct. 651, 655-56, 54 L.Ed.2d 586 (1978). At least in the circumstances presented here, where the union has no reinstatement objective and assent to the union's demands for recognition and bargaining will not require the company to violate existing contracts with another union or to accept contract terms pertaining to the selection of grievance representatives, it is reasonable for the Board to conclude that such activity does not restrain or coerce the employer in the selection of its representatives for collective bargaining or the adjustment of grievances. The Supreme Court has explained that "Congress did not design § 8(b)(1)(B) to guarantee employers the undivided loyalty of § 8(b)(1)(B) representatives." Royal Electric, 481 U.S. at 583, 107 S.Ct. at 2009. Consistent with this view, the Board has reasonably concluded that the evidence that MEBA's attainment of recognition and collective bargaining would restrain or coerce Inland's selection of § 8(b)(1)(B) representatives is too speculative and attenuated to support an unfair labor practice charge.
 
 III. CONCLUSION
 
 22
 We affirm the Board's conclusion that MEBA's picketing did not have a reinstatement objective and that, in the circumstances of this case, striking and picketing for recognition and bargaining did not constitute a § 8(b)(1)(B) violation. The petition for review is
 
 
 23
 Denied.
 
 
 24
 Inland also claims, citing Pelfrey's testimony, that the Union sought contract terms mandating specific hiring hall provisions which would affect Inland's selection of § 8(b)(1)(B) representatives. However, even a cursory review of Pelfrey's testimony belies this contention. When asked whether MEBA, once recognized, would seek to have Inland agree to hiring hall procedures, Pelfrey answered: "I don't know. Depend[s] on the times and circumstances.... My intentions right now are to organize Inland Lakes. I haven't thought about the contract down the road."
 
 
 
 [2]
 In the decision below, the Board treated Westchester Marine and Cove Tankers in a rather cursory fashion, explaining that in those cases, "the unions' objectives included seeking reinstatement of 8(b)(1)(B) representatives, in addition to seeking other objectives, and in those circumstances the Board found that the unions' 'entire course of conduct' violated Sec. 8(b)(1)(B)." 305 N.L.R.B. No. 60 at 2 n. 2
 
 
 [3]
 The other cases cited by Inland for the proposition that all picketing violates § 8(b)(1)(B) are more easily distinguished. In each such case, the court found that the picketing violated the statute because it was motivated by an impermissible replacement objective. See Int'l Org. of Masters, Mates and Pilots, 486 F.2d at 1273 (replacement object was conceded); Newport Tankers Corp. v. NLRB, 575 F.2d 477, 480 (4th Cir.), cert. denied, 439 U.S. 928, 99 S.Ct. 313, 58 L.Ed.2d 321 (1978) (union's efforts to force employer to hire an extra grievance adjuster were found to be equivalent of seeking replacement); Maritime Overseas Corp., 955 F.2d at 217-19 (vast array of evidence of replacement objective)